UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GRACE GILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14CV1924 HEA |
| | ) | |
| THE PRINCIPIA CORPORATION | ) | |
| d/b/a PRINCIPIA COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendant's Motion to Dismiss. [Doc. No. 11]. Plaintiff filed a Response in Opposition to the Motion. [Doc. No. 16]. Defendant filed a Reply. [Doc. No. 17]. For the reasons set forth below, the Motion to Dismiss will be granted without prejudice.

**Facts and Background[1]**

Plaintiff attended Principia College between August 2009 and May 2013, when she graduated. Principia College is owned and operated by the Principia Corporation, and is an accredited private, co-educational four-year liberal arts and science college for Christian Scientists, located in Elash, Illinois.[2] Plaintiff's various accomplishments, leadership experience, community involvement, and commitment to Christian Science resulted in Principia College awarding her a scholarship at the "Trustee level"—an accomplishment shared by only a select few in her graduating class.

---

[1] The recitation of facts is taken from Plaintiff's Second Amended Complaint and are taken as true for the purposes of this motion. Such recitation in no way relieves any party from the necessary proof thereof in later proceedings.

[2] The Principia Corporation is a Missouri Corporation, headquartered in Missouri.

Plaintiff, as a Christian Scientist, chose to attend Principia College because it represented itself as a small, safe, supportive Christian Science environment, and because its policies—both express and implied—set forth the rules, responsibilities, and expectations for all those on campus, including students, faculty, staff and administration. Plaintiff was led to believe that Principia College was the "perfect place for her to attend college" by Principia's representation of itself as a "healing environment," which "mandated certain behaviour, prescribed certain beliefs, and promised to help her with various aspects of her life." According to Plaintiff, Principia College "promised to help Plaintiff become a well rounded person, intellectually, spiritually, morally, socially, emotionally, and physically," and offered "an enriching music education."

Principia's promise to students that they will be educated in an environment based on Christian Science teachings is "understood to be upheld by Principia College through regulation of the 'Principia College Community'—students, faculty, staff, and administration—including requiring certain conduct, prohibiting certain conduct, and establishing a system for dispute resolution." To this end, all students are required sign the Principia Pledge, which states:

> I commit to serve God and humanity through the study and healing practice of Christian Science, expressed in principled though and action, unselfish love, and moral courage.

> Further, all students, faculty, and administrators are required to sign the "Principia Community Commitment, which states:

> Strive – to understand and express God in all you do
> Conquer – "all that is unlike God"
> Love – "God . . . and your neighbour as yourself" (Luke 10:27)
> Give – unselfishly

Plaintiff provides additional quotations from various Principia College catalogues further reinforcing its professed commitment to the beliefs of Christian Science, and its expectation that students, faculty, and administrators will be equally committed. These include pledges to rely on

Christian Science for healing; study the bible; pray; attend church services; forego the use of alcohol, tobacco, illegal substances, and medication; forego premarital and extramarital sexual activity; forego engagement in homosexual activity; and resolve disputes via the "Matthews Ethos."[3] Further, Principia College, via the policies of its Restoration Justice Board and Community Board, promises an individual accused of wrongs the right to know the details behind alleged violations and the right to discuss with, and question, others about the case, and defend themselves. Further, Principia promises that "before excluding [a] student from class, the instructor will inform the student in writing of the reason for the exclusion and allow the student to respond. A copy of the letter will be sent to the Scholastic committee."

Additionally, Principia College requires its community to "Get Help When There is Immediate Danger," which means that when "a community member is aware of circumstances that threaten someone's immediate well-being, he or she should act to prevent harm and, if necessary, get help. Confidentiality is outweighed by the need to get help."

According to Plaintiff, she enjoyed her time and education at Principia College for approximately two years. However, Plaintiff's experience was ultimately marred by the circumstances surrounding two events. First, the Dean of Students and other staff failed to take action regarding Plaintiff's disclosure that she was "suffering from a possible terminal illness." Second, one of Plaintiff's instructors was openly hostile and unfairly excluded her from his music class for no legitimate reason, thus preventing her from completing a major in music.

With regard to her "possible terminal illness," Plaintiff states that she repeatedly informed Principia College about her physical state and concerns, but that Principia did little, if anything, in response to her statements and pleas for help. Plaintiff suggests a myriad of possible actions Principia College could have, but ultimately did not, undertake. These include: calling

---

[3] According to the "Matthews Ethos," a person "should love his neighbor enough to talk directly with him/her if there is a problem."

911; contacting on campus Christian Science nurses and asking them to daily check in on Plaintiff's wellbeing; contacting Plaintiff's parents; allowing Plaintiff to receive care from on campus Christian Science nurses while participating in class; communicating with Plaintiff's instructors to ensure Plaintiff had a "more harmonious and supportive experience in the classroom and with assignments"; allowing Plaintiff to take a part-time credit load, a less challenging credit-load, and/or extending the length of her courses over their normal term lengths; communicating with Plaintiff's on-campus employers to either have them accommodate her needs or discontinue her employment; working with the financial aid office to ensure Plaintiff's ability to afford being enrolled at Principia while potentially being unable to be gainfully employed; assisting Plaintiff in finding charitable assistance that would address the costs and needs associated with being physically unfit; or working with Plaintiff to honorably withdraw from enrollment for a period of time while she recovered.

With regard to her exclusion from a music class, Plaintiff alleges that the instructor yelled at her repeatedly in an angry tone and with harsh language; threatened her grade in his class when she asked questions about the nature of exam questions or exam formats; refused to assist her with methods to better learn the course material; openly mocked her as a "slow learner" when she confessed how hard and long she studied for an exam for which she received a poor grade; consistently talked over her; and resisted giving her any chance to speak when meeting over academic issues with her and other students. Further, the instructor harassed and embarrassed Plaintiff by: excluding her name when listing or calling on students; slamming doors when leaving Plaintiff after yelling and becoming upset with her; telling Plaintiff she should withdraw from his class after Plaintiff asked for applied examples of theory referenced in his lectures; becoming agitated when Plaintiff asked for clarification about what was said that offended the instructor; and showing highly favorable behavior when speaking with other

students immediately before or after speaking to Plaintiff to emphasize the instructor's ill will toward Plaintiff. Following Plaintiff's exclusion from the class, Plaintiff, in keeping with the rules imposed by Principia College, attempted to discuss the matter and its possible resolution with the instructor, but he refused to engage in discourse with her, despite being required to do so by Principia's rules. The instructor reported the incident to the Dean of Students and the Director of Human Resources. Plaintiff was threatened with suspension by Principia College if she discussed the situation with anyone not already involved.

Plaintiff requested permission to undertake an independent study of the required music course, with a different instructor, but her request was denied. Principia was on notice of Plaintiff's love of music and her desire to major in that field, but failed to remedy the academic situation. This only exacerbated her "possible terminal illness" and emotional state, which in turn "prompted further cries for help" which also went unanswered.

Plaintiff requested remedial compensation and tried to resolve matters through employing the "Matthews Ethos." When these attempts were unsuccessful, she threatened to "involve the school community in the discussion about how she had been treated." As a result, Principia College "resorted to threatening Plaintiff, a student, with expulsion, as the risk of exposing the un-Christian nature of Principia College's actions would likely harm its advertisement of a caring, Christian Science Community." Plaintiff graduated in May 2013 and subsequently provided Principia with a list of proposed solutions to resolve the matter. In response, Principia terminated Plaintiff from her on-campus job and gave her approximately one hour to pack all of her belongings and leave campus under the threat of arrest.

As a result of, and during, these events, Plaintiff suffered from: severe stress-induced insomnia which prevented Plaintiff from sleeping for days on end; the inability to focus on or complete school work due to her emotional distraction; living and attempting to function with

very little, if any sleep; and the severe physical symptoms related to extreme stress. Plaintiff spent over $1,000 on Christian Science practitioner treatments for the physical and emotional problems arising out of Principia College's outrageous conduct.

Plaintiff filed her Second Amended Complaint on March 23, 2015, bringing cause of action for breach of contract (Count I); intentional infliction of emotional distress ("IIED") (Count II); negligent infliction of emotional distress ("NIED") (Count III); and negligence (Count IV).[4]

**Standard**

A complaint must set out a "short and plain statement of [a plaintiff's] claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To test the legal sufficiency of a complaint, a defendant may file a motion to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a plaintiff must plead facts from which the court can draw a "reasonable inference" of liability. *Iqbal*, 556 U.S. at 678. The complaint need not contain "detailed factual allegations" but must contain more than mere "labels and conclusions, and a formulaic recitation of the elements" or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555, 557. An "unadorned, the-defendant-unlawfully-harmed-me accusation" will not suffice. *Iqbal*, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," *id.* at 679, which "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555.

---

[4] Plaintiff initially filed her Complaint on November 14, 2014. [Doc. No. 1]. She filed her First Amended Complaint on November 28, 2014. [Doc. No. 2]. Defendant filed a Motion for a Definite Statement on January 21, 2015 [Doc. No. 5], and in response thereto, the Court granted Plaintiff's Motion for Leave to File a Second Amended Complaint.

Under *Twombly* and *Iqbal*, "[a] plaintiff . . . must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). If the plaintiff "inform[s] the [defendant] of the factual basis for [her] complaint, [she] [is] required to do no more to stave off threshold dismissal for want of an adequate statement of [her] claim." *Id.*

In evaluating a motion to dismiss, the court can "choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Turning to any "well-pleaded factual allegations," the court should "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* The court may only consider the initial pleadings. *Brooks v. Midwest Heart Grp.*, 655 F.3d 796, 799 (8th Cir. 2011).

**Discussion**

Defendant argues that Plaintiff's Second Amended Complaint fails to state any of the claims alleged because her allegations are non-cognizable claims for educational malpractice and because she has failed to adequately allege the outrageous conduct, as well as sole intent, elements necessary for her IIED and NIED claims. For the reasons that follow, the Court agrees and will grant Defendant's Motion, without prejudice.

**A.      Breach of Contract**

Plaintiff's legal theory is that Principia College's theological, educational, and community-guidance principles—which are expressed in its various catalogues and academic literature—are enforceable contractual promises, and that Defendant breached these contractual obligations through failing to take any of the actions suggested by Plaintiff above. Defendant counters that this is merely a thinly veiled claim for educational malpractice, which is not a recognized cause of action in Missouri. The Court agrees with Defendant.

"To make a submissible case for breach of contract claim, a plaintiff must allege and prove: (1) a mutual agreement between parties capable of contracting; (2) mutual obligations arising out of the agreement; (3) valid consideration; (4) part performance by one party; and (5) damages resulting from the breach of contract." *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs.*, 204 S.W.3d 183, 203 (Mo. Ct. App. 2006) (citing *Norber v. Marcotte*, 134 S.W.3d 651, 658 (Mo. Ct. App. 2004)). Claims for educational malpractice, under either tort or contract, are not recognized under Missouri law, because the courts "have refused to become the overseers of both the day-to-day operation of [the] educational process as well as the formulation of its governing policies." *See Dallas Airmotive, Inc. v. FlightSafety Int'l*, 277 S.W.3d 696, 700 (Mo. Ct. App. 2008) (alteration in original) (quoting *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 472 (Minn. Ct. App. 1999)); *see also Lucero v. Curators of the Univ. of Mo.*, 400 S.W.3d 1, 8 (Mo. Ct. App. 2013) ("Generally, courts have refrained from recognizing educational malpractice claims, either in tort or contract, on the premise that '[u]niversities must be allowed the flexibility to manage themselves and correct their own mistakes.'") (quoting *Miller v. Loyola Univ. of New Orleans*, 829 So. 2d 1057, 1061 (La. Ct. App. 2002)); *Ross v. Creighton Univ.*, 957 F.2d 410, 414 (7th Cir. 1992) (noting, among other reasons for prohibiting educational malpractice claims, that recognizing such claims could create "a flood of litigation against schools," given that "education is a service rendered on an immensely greater scale than other professional services.").

In *Lucero*, the Missouri Court of Appeals noted that the student's allegations that the University allegedly breached its contractual obligations "[could] be categorized as addressing either (1) [the University's] failure to ensure a proper learning atmosphere or (2) [the University's] failure to adhere to university procedures and schedules." 400 S.W.3d at 5. The student contended that the provisions he identified "represent[ed] specific promises breached by

[the University] with respect to how the University handled [a] situation between [the student] and [a professor]." *Id.* at 6. The *Lucero* court, however, found that the cited portions of the collected rules, regulations and faculty bylaws did not constitute specific promises, but, rather, were "aspirational in nature." *Id.* The provisions upon which the student in *Lucero* relied were similar in many respects to the provisions Plaintiff identifies in the instant action.[5] The *Lucero* court explained that "[t]he sections identified by [the student] amount to general statements that Respondent, as a university, seeks to achieve in maintaining a positive work and learning environment" and that "[s]uch statements, therefore, cannot constitute the basis for a breach of contract claim." *Id.* This case presents a nearly identical scenario.

Were the Court to wade into the issue of how closely Principia College operated within the constructs of the plethora of vague, general, and aspirational "mission statement-esque" provisions cited by Plaintiff, the Court would be forced to engage—with complete disregard for Missouri law—in an educational malpractice analysis rife with the practical and policy concerns

---

[5] The *Lucero* court found that the following provisions, which the student argued were enforceable promises, were merely "aspirational in nature":

> The University of Missouri is committed to providing a positive work and learning environment where all individuals are treated fairly and with respect, regardless of their status. Intimidation and harassment have no place in a university community. To honor the dignity and inherent worth of every individual—student, employee, or applicant for employment or admission—is a goal to which every member of the university community should aspire and to which officials of the university should direct attention and resources.
>
> With respect to students, it is the university's special responsibility to provide a positive climate in which students can learn. Chancellors are expected to provide educational programs and otherwise direct resources to creative and serious measures designed to improve interpersonal relationships, to help develop healthy attitudes toward different kinds of people, and to foster a climate in which students are treated as individuals rather than as members of a particular category of people.
>
> As a teacher, the Professor encourages the free pursuit of learning in his/her students. He/she holds before them the best scholarly standards of his/her discipline. He/she demonstrates respect for the student as an individual, and adheres to his/her proper role as intellectual guide and counselor. He/she makes every reasonable effort to foster honest academic conduct and to assure that his/her evaluation of students reflects their true merit. He/she respects the confidential nature of the relationship between professor and student. He/she avoids any exploitation of students for his/her private advantage and acknowledges significant assistance from them. He/she protects their academic freedom.

400 S.W.3d at 5–6.

identified in *Lucero* and *Ross*. Plaintiff's reliance on *Robbe v. Webster University*, 2015 U.S. Dist. LEXIS 38107 (E.D. Mo. Mar. 25, 2015), where this Court found that a breach of contract claim could lie against a University, is completely unavailing. In *Robbe*, the Court expressly found that the operative claim was not an impermissible claim for educational malpractice because the student's argument— "that the setting of a thesis defense date signifie[d] a determination that the thesis ha[d] been deemed to be passable, and that [the faculty], after establishing a thesis defense date, failed to permit Plaintiff to defend her thesis"—"challenge[d] [Defendant's] failure to provide the promised service, not its quality." *Id.* at 15. Here, by contrast, Plaintiff's entire argument goes toward the alleged poor quality of her educational experience in terms of Principia College's alleged failure to conform to its expressed Christian Science foundation. Plaintiff successfully graduated from Principia College and thus received the ultimate educational service—a degree. Accordingly, *Robbe* is easily distinguishable. Although Plaintiff did not receive a degree in her desired major, music, Defendant accurately notes that "the Second Amended Complaint fails to allege that Principia made any particularized promise that Principia students are unconditionally entitled not to be excluded from any class; are unconditionally entitled to complete or pass any class; or are unconditionally entitled to complete any major they choose, on whatever terms they choose." [Doc. No. 17 at 5]. Indeed, Plaintiff has failed to allege or identify any such promises.

Plaintiff's request for the Court to undertake an examination of Prinicpia College's application of its general aspirational statements is made more precarious by the fact that the above cited statements are teeming with overt references to religious teachings and beliefs. Plaintiff explains in her Second Amended Complaint that:

> Christian Science can be characterized as four things: a church, a religion, a philosophy, and a system of healing:

> The church, known as The Church of Christ, Scientist, was founded by Mary Baker Eddy in the 19th century. It is centrally located in Boston, Massachusetts and has numerous independently-run "branch churches" located around the world.
>
> The religion is a Christian denomination, with emphasis on the Bible and Christ Jesus.
>
> The philosophy is based upon metaphysical concepts about the nature of reality.
>
> The system of healing is recognized by the federal government as being a legitimate approach to treating physical ailments, as evidenced in a medical tax deduction for care under this system, as well as in other ways.
>
> Principia College's goal is to provide foster and promote "individual healing."
>
> As stated in the Principia College Catalog "With individual healing as our goal, rather than merely the establishment of an orderly school, we shall eventually find the result to be demonstrated order, honesty, and purity in the entire body of pupils . . . ."

[Doc. No. 10 at 1–2] [alteration in original].

Notwithstanding the noncognizability of educational malpractice claims in Missouri, this Court would be reticent to adjudicate the question of what Christian Science scriptures require in the areas of dispute resolution and properly fostering a "healing environment" in an academic setting. *See Thomas v. Review Bd. Of Indiana Employment Sec. Div.*, 450 U.S. 707, 715–16 (1981) (noting that "the judicial process is singularly ill equipped to resolve [intrafaith] differences in relation to . . . Religion Clauses," and that "Courts are not arbiters of scriptural interpretation."); *Jones v. Wolf*, 443 U.S. 595, 603–04 (1979) (rejecting an approach that "would require the civil court to resolve a religious controversy," and explaining that a doctrine for resolving property disputes known as the "neutral principles approach" is designed "to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice"); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713 (1976) (noting the general rule that "religious controversies are not the proper subject of civil court inquiry."); *Presbyterian Church v. Hull Memorial Presbyterian Church*, 393 U.S. 440, 445–46 (1969) (noting that it is

- 11 -

"wholly inconsistent with the American concept of the relationship between church and state to permit civil courts to determine ecclesiastical questions.") (citing *Watson v. Jones*, 13 Wall. 679 (1872)); *Houston v. Mile High Adventist Academy*, 846 F. Supp. 1449 (D. Col. 1994) (holding that the adjudication of whether a child was provided an adequate biblical Christian education was barred by the First Amendment).

For these reasons, the Court will grant Defendant's Motion as to Plaintiff's breach of contract claim.

**B.      Intentional Infliction of Emotional Distress**

Defendant argues that Plaintiff's IIED claim should be dismissed because she failed to allege the requisite outrageous or extreme conduct, and because it cannot reasonably be inferred that the alleged conduct was intended solely to cause extreme emotional distress. The Court agrees, in part, and will grant Defendant's Motion as to Plaintiff's IIED claim.

"To recover for intentional infliction of emotional distress, [a plaintiff] must show (1) the defendant's conduct was extreme and outrageous; (2) the defendant acted intentionally or recklessly; and (3) the defendant's conduct caused extreme emotional distress resulting in bodily harm." *Cent. Mo. Elec. Co-op. v. Balke*, 119 S.W.3d 627, 636 (Mo. Ct. App. 2003) (citing *Thomas v. Special Olympics Missouri, Inc.*, 31 S.W.3d 442, 446 (Mo. Ct. App. 2000)); *see also St. Anthony's Medical Center v. H.S.H.*, 974 S.W.2d 606, 611 (Mo. Ct. App. 1998).

Defendant cites the Missouri Court of Appeals in *Crow v. Crawford & Company* for an IIED standard that includes an element requiring the conduct to be intended solely to cause extreme emotional distress to the victim. 259 S.W.3d 104, 119 (Mo. Ct. App. 2008). However, the Missouri courts have explained that this element applies "where one's conduct *amounts to the commission of a traditional tort*[.]" *Diehl v. Fred Weber,*

*Inc.*, 309 S.W.3d 309, 322 (Mo. Ct. App. 2010) (emphasis added) (citing *K.G. v. R.T.R.*, 918 S.W.2d 795, 799 (Mo. 1996) (en banc)). In such a scenario, if the alleged conduct "was not intended *only* to cause extreme emotional distress to the victim, the tort of intentional infliction of emotional distress will not lie and recovery must be had under the appropriate traditional tort action." *Id.* (emphasis added) (citing *K.G.*, 918 S.W.2d at 799). The Missouri Supreme Court explains that "[t]he rationale behind this rule is that the tort of intentional infliction of emotional distress . . . . was intended to supplement existing forms of recovery, not swallow them." *K.G.*, 918 S.W.2d at 799 (citation omitted). For example, "[w]hile recovery for emotional distress caused by battery may be allowable as an element of damages in a battery action, there is no independent action for intentional infliction of emotional distress where the existence of the claim is dependent upon a battery." *Id.* Thus, because Plaintiff has not alleged intentional infliction of emotional distress predicated on a traditional tort, such as battery, Plaintiff need not allege and prove that Defendant engaged in the alleged conduct solely to cause Plaintiff's alleged extreme emotional distress.

However, the Court does find that Plaintiff has not alleged the requisite extreme and outrageous conduct. The alleged conduct in an IIED claim "must have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. banc 1997) (internal quotations omitted). The conduct alleged here—essentially a music instructor verbally treating Plaintiff harshly and unfairly—is vaguely alleged and appears to fall well short of a level of extremity that could be said to exceed all possible bounds of decency and be

regarded as atrocious and utterly intolerable.[6] To hold otherwise would be to drastically expand the conduct covered by IIED claims.

For these reasons, the Court will grant Defendant's Motion as to Plaintiff's IIED claim.

**C.     Negligence and Negligent Infliction of Emotional Distress**

Defendant argues that Plaintiff's negligence and NIED claims should be dismissed because Plaintiff's allegations failed to establish that Defendant owed Plaintiff any duty of care to protect her from a reasonably foreseeable likelihood of harm, or that Defendant's alleged conduct involved an unreasonable risk of causing emotional distress.

"Any action for negligence requires the plaintiff to establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the plaintiff's injury was proximately caused by the defendant's failure." *Jarrett v. Jones*, 258 S.W.3d 442, 448 (Mo. banc 2008) (citing *Krause v. U.S. Truck Co., Inc.*, 787 S.W.2d 708, 710 (Mo. banc 1990)). A plaintiff may recover under a theory of negligent infliction of emotional distress if she can additionally prove: (1) the defendant should have realized that its conduct involved an unreasonable risk of causing the distress, and (2) the emotional distress or mental injury is medically diagnosable and is sufficiently severe as to be medically significant. *Id.* (citing *Bass v. Nooney Co.*, 646 S.W.2d 765, 772–73 (Mo. banc 1983)).

With regard to Plaintiff's negligence claim, she cites case law for the proposition that "[c]ourts have recognized that the relationship between a student and a school she attends gives rise to a duty on the part of teachers or administrators to obtain medical assistance for an injured or ill student." *Woods v. Wills*, 400 F. Supp. 2d 1145, 1165 (E.D. Mo. 2005). However, *Woods* is distinguishable. In that case, most of the plaintiff students were minors who "assert[ed] that

---

[6] *Compare Young v. Stensrude*, 664 S.W.2d 263, 265 (Mo. Ct. App. 1984) ("The dispositive question, therefore, is whether the pleaded acts of showing a pornographic movie to an unsuspecting female in a room with five men while making obscene remarks to her could ever rise to extreme or outrageous conduct or create an unreasonable risk of inflicting the requisite harm. To answer the question in the negative is to subject this plaintiff, as a matter of law, to unwilling exposure to acts which may be totally intolerable in today's civilized society.").

because the defendants had complete control over them at [the boarding school] for the necessities of life, including food, water and medical care, the defendants had a duty to provide medical care when needed, failed to do so, and the plaintiffs suffered injury as a result." *Id.* at 1177–78; *see also id.* at 1178 ("[P]laintiffs allege they were under defendants' complete control and supervision while enrolled at [the boarding school] and therefore defendants had a duty to obtain necessary medical care for them, that plaintiffs became ill while at [the boarding school] and needed medical care, but defendants failed to obtain necessary medical care for them, and plaintiffs suffered injury as a result."). This is markedly different than Plaintiff's circumstances, as an adult in college. Further, Plaintiff alleges only that she suffers from a "possible terminal illness." This allegation is not pled with the specificity required by *Twombly* and *Iqbal*.

Plaintiff also relies upon *Stineman v. Fontbonne College*, 664 F.2d 1082 (8th Cir. 1981), categorizing it as a case "where the Eighth Circuit applied Missouri law to rejected the defendant-college's argument that it owed no duty to obtain medical assistance." [Doc. No. 16 at 17]. However, in *Stineman*, the student was on the school softball team, was injured in practice when she was struck in the eye by a ball, was advised by her coaches not to seek medical care but instead to lie down, and eventually lost her eye as a result of the delay in treatment. The facts of this case—where Plaintiff alleges a vague "possible terminal illness," and no injury beyond insomnia and stress surrounding her insomnia, is distinguishable. Plaintiff's negligence claim fails and the Court will grant Defendant's Motion as to this claim.

With regard to Plaintiff's NIED claim, her Second Amended Complaint contains no allegations plausibly demonstrating an *unreasonable* risk of emotional distress. As with her IIED claim, to find otherwise in the NIED context would be to greatly expand the tort. For these reasons, the Court will grant Defendant's Motion as to Plaintiff's NIED claim.

## Conclusion

Based on the foregoing, the Court will grant Defendant's Motion to Dismiss, without prejudice.[7] The Court will grant Plaintiff leave to amend her Second Amended Complaint, if she can, to address these deficiencies.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [Doc. No. 11] is **GRANTED without prejudice**.

**IT IS FURTHER ORDERED** that the hearing on Defendant's Motion scheduled for June 16, 2015 is **VACATED**.

**IT IS FURTHER ORDERED** that Plaintiff is given 14 days from the date of this Opinion, Memorandum and Order to file an amended complaint.

Dated this 2nd day of June, 2015.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

---

[7] The Court notes that a hearing was set for this Motion upon Defendant's request. In granting the Motion, the Court will vacate the hearing.